UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REUEL JACQUES ABALE GNALEGA,  )
                                                                )
      **Plaintiff,**                                      )
                                                                )
      v.                                                   )   Case No. 18-cv-00514 (APM)
                                                                )
WASHINGTON DC VETERANS                   )
MEDICAL CENTER,                                     )
                                                                )
      **Defendant.**                                    )
                                                                )

## MEMORANDUM OPINION AND ORDER

### I.

Pro se Plaintiff Reuel Jacques Abale Gnalega claims that, in January 2014, he suffered an electrocution injury during a nerve conduction test performed by Dr. Michael Pfeiffer, a medical provider employed by Defendant Washington Veterans Medical Center ("VA"). *See* Am. Compl., ECF No. 3 [hereinafter Am. Compl.], at 1, 3–6.[1] Fairly construed, Plaintiff advances a medical negligence claim against the United States under the Federal Tort Claims Act ("FTCA").[2] To be timely, Plaintiff had to first present this claim in writing to the VA "within two years after such claim accrue[d]." 28 U.S.C. § 2401(b). There is no dispute that Plaintiff filed his administrative claim with the VA on May 31, 2017, more than one year after the two-year limitation expired, if measured from the date of the nerve conduction injury. What the parties dispute is when the claim accrued.

---

[1] Throughout the opinion, the court uses the pagination generated by CM/ECF, not the numbering provided by Plaintiff.
[2] Defendant rightly notes that claims under the FTCA must be brought against the United States, while Plaintiff asserts his claim against the "Washington Veterans Medical Center." Though Plaintiff has named the wrong defendant, the court is required to construe pro se filings liberally and therefore treats this action as if filed against the United States. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

II.

The Supreme Court's decision in *United States v. Kubrick* is the starting point for the court's analysis. *See* 444 U.S. 111 (1979). Like this case, *Kubrick* was a medical malpractice case brought under the FTCA. *See id.* at 113–14. The Court of Appeals had held that a plaintiff's claim does not begin to accrue "until he knows or should suspect that the doctor who caused the injury was legally blameworthy." *Id.* at 121. The Supreme Court rejected that formulation, writing "[w]e . . . cannot hold that Congress intended that 'accrual' of a claim must await awareness by the plaintiff that his injury was negligently inflicted." *Id.* at 123. Instead, the Court explained, a plaintiff "armed with the facts about the harm done to him" could "protect himself by seeking advice in the medical and legal community" to determine whether negligence was the cause of his injury. *Id.* "To excuse him from promptly doing so by postponing the accrual of his claim would undermine the purpose of the limitations statute, which is to require the reasonably diligent presentation of tort claims against the Government." *Id.* Thus, in that case, the Court concluded that the plaintiff's cause of action began to accrue at the time he "was aware of his injury and its probable cause." *Id.* at 357; *accord Sexton v. United States*, 832 F.2d 629, 633 (D.C. Cir. 1987) ("Even where the government agents' negligence takes the form of omission, a plaintiff's understanding of the basic nature of the treatment should suffice to begin the statute running. If the plaintiff knows these critical facts, he need only undertake a reasonably diligent investigation to determine whether a cause of action may lie.").

Applying the principles set forth in *Kubrick*, it is clear that Plaintiff has pleaded himself out of a timely cause of action. In his Amended Complaint, Plaintiff describes feeling immediate, intense pain to his ankle area during the nerve conduction test performed by Dr. Pfeiffer. *See* Am. Compl. at 4 (alleging that "[a]s soon as the [n]erve conduction test started, I jumped in pain and

agony"; asserting the testing "shocked me to so much incredible pain I almost fell out of my chair"; averring the "second part of the test went unhinged"; and stating that "I was in traumatic pain from where [Dr. Pfeiffer] had put the electricity on my ankle"). That pain continued unabated in the ensuing days, causing Plaintiff to report to the emergency room. *See id.* at 5 (alleging that he went to the emergency room "a few days later" because he "couldn't feel [his] left leg" and "felt as though [he] was having a heart attack"). At the emergency room, Plaintiff apparently noticed for the first time a "bump on [his] left ankle exactly where [Dr. Pfeiffer] had put the machine during the nerve conduction test." *Id.* at 5–6. He then insisted on receiving an ultrasound, which Plaintiff describes as "vivid[ly]" showing a contrast between his left and right legs. *Id.* at 6. Additionally, Plaintiff admits to receiving follow-up treatment and care from specialists. *See id.* at 7–8. And, notably, based on his experience, Plaintiff warned a friend not to undergo a nerve conduction test. *See id.* at 5 ("I had no idea what had just transpired even telling one of my friend[s] later who was scheduled for one not to do it because it was so painful.").

As the foregoing allegations demonstrate, Plaintiff's cause of action accrued if not on the day Dr. Pfeiffer administered the nerve conduction test in January 2014, then certainly shortly thereafter. Plaintiff knew the "critical facts" that would put him on notice of a claim. *Sexton*, 832 F.2d at 633. He admits as much in his opposition:

> In my case luckily, the first signs showed after a few days after [Dr. Pfeiffer's] intervention . . . The only person that puts himself around my left ankle (dorsal) with an electrical device is [Dr. Pfeiffer] a few days before the symptoms were noted for the first time ever in my left ankle . . . The first sign of an ankle bump is days after [Dr. Pfeiffer performed the] EMG test.

Pl.'s Opp'n to Def.'s Mot. to Dismiss, ECF No. 19 [hereinafter Pl.'s Opp'n], at 12–13. Thus, by his own admission, within days Plaintiff knew enough about the injury and its cause to put him on notice about a potential claim. Yet, Plaintiff waited more than three years after suffering his injury

3

to file his administrative claim with the VA. *See* Am. Compl. at 19 (filing of first claim on May 31, 2017). This action is therefore untimely.

III.

Plaintiff makes two arguments to avoid this conclusion. First, he argues that he did not discover the actual cause of his injury until much later (though he does not say precisely when). Plaintiff states that, even though he experienced immediate pain from the nerve conduction test, he remained uncertain as to whether the cause of his ankle injury was an earlier cortisone injection to his lumbar area or the nerve conduction test, *id.* at 3, 6, 47, and that he learned that the test was the reason for his pain only after speaking to a personal injury lawyer, Compl., ECF No. 1, at 15. Thus, he suggests, his claim did not accrue until he had certainty that Dr. Pfeiffer had caused his injury. *See* Pl.'s Opp'n at 15–17. But the Supreme Court in *Kubrick* did not hold that a plaintiff must have absolute certainty as to causation before his claim starts to accrue. Rather, he need only know "the facts about the harm done to him," for it is at that point that the law places upon him the burden of undertaking a reasonably diligent investigation to determine if he has a cause of action. *Kubrick*, 444 U.S. at 123. For that reason, the clock started to run on the plaintiff in *Kubrick* when he "was aware of his injury and its *probable* cause." *Id.* at 118 (emphasis added). Accordingly, in this case, it matters not when he was advised by a lawyer that Dr. Pfeiffer had caused his injury. Rather, for accrual purposes what matters is that Plaintiff had possession of "the facts about the harm done to him," if not during the nerve conduction test itself, then shortly thereafter.

Next, Plaintiff appears to assert that the limitations period remained tolled until March 2016 under the "continuing course of treatment" doctrine. *See* Pl.'s Request for Judgment, ECF

No. 24, at 11.[3]  That equitable doctrine provides that "when there has been a course of continuous medical treatment, a cause of action for malpractice accrues at the end of the continuous treatment if the treatment has been for the same illness or injury out of which the claim for malpractice arose." *Page v. United States*, 729 F.2d 818, 823 n.36 (D.C. Cir. 1984) (citation omitted).

Plaintiff has not, however, shown that the continuous-treatment doctrine plausibly applies to the facts alleged. *See Bayer v. U.S. Dep't of Treasury*, 956 F.2d 330, 333 (D.C. Cir. 1992) (stating that the plaintiff bears the burden of pleading that the court should exercise its equitable power to toll a limitations period). Courts have held that the continuous-treatment doctrine tolls the limitation period only "until the doctor ceases to treat the patient in the specific matter at hand." *Patteson v. AstraZeneca, LP*, 876 F. Supp. 2d 27, 37 (D.D.C. 2012) (quoting *Anderson v. George*, 717 A.2d 876, 878 (D.C. 1998)). Courts ordinarily do not permit the continuous-treatment doctrine to encompass care from succeeding government physicians. *See Page*, 729 F.2d at 823 n.36 (stating that "'treatment from succeeding government physicians' does not interrupt the running of the limitation when the personal relationship with the physician charged with malpractice has ended and that physician 'is not claimed to have acted in direct concert with the succeeding physicians'") (quoting *Brown v. United States*, 353 F.2d 578, 580 (9th Cir. 1965)); *see also Miller v. United States*, 932 F.2d 301, 305 (4th Cir. 1991) (recognizing that "the rationale for this tolling theory only permits its application when the treatment at issue is for the same problem and by the same doctor, or that doctor's associates or other doctors operating under his direction"). Courts impose this limitation because the doctrine itself is premised on the unique physician-patient

---

[3] Plaintiff's invocation of the continuous-treatment doctrine is arguably untimely. He raised it for the first time in his later-filed "Request for Judgment," *see id.*, not in opposition to Defendant's motion, thereby depriving Defendant an opportunity to respond. The argument therefore is conceivably waived. *Cf. Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428–29 (D.C. Cir. 2014) (treating as waived a plaintiff's failure to raise a Rule 26(e) argument in an opposition). Nevertheless, because of Plaintiff's pro se status, the court will consider the issue.

relationship and the accompanying notion that it would be "absurd" to require a wronged patient to interrupt corrective efforts from the provider who committed the wrong by filing a lawsuit. *See Page*, 729 F.2d at 823 n.36 (citation omitted); *Patteson*, 876 F. Supp. 2d at 37–38 (calling it "ludicrous to expect a patient to interrupt a course of treatment by suing the delinquent doctor") (internal quotation marks and citation omitted); *cf. Wehrman v. United States*, 830 F.2d 1480, 1485 (8th Cir. 1987) (finding continuous-treatment doctrine applicable where the plaintiff alleged "continuing negligence" on the part of multiple VA doctors at the same medical facility who "continued him on the same treatment" and failed to recommend an alternative approach). Further, a limitation period is not tolled by "merely intermittent medical services" or "merely occasional hospital visits at substantial intervals." *Page*, 729 F.2d at 823 n.36 (citations omitted). Thus, once the "unique" relationship ends and the particular treatment ceases, the limitations period starts to run.

Here, according to the complaint, Plaintiff's relationship with Dr. Pfeiffer ended almost immediately, and he was subjected to no further nerve conduction testing thereafter. Plaintiff avers that he came to the VA in January 2014 because of radiating back pain. *See* Am. Compl. at 1–2. It was in connection with that medical problem that Dr. Pfeiffer administered the nerve conduction test. *Id.* at 3–4. Following the test, Plaintiff alleges, Dr. Pfeiffer "seemed upset at me at the fact that I had been in so much pain during the test, he wouldn't answer me after the test *and he disappeared*." *Id.* at 5 (emphasis added). Plaintiff alleges no further treatment or care from Dr. Pfeiffer. Nor does he allege any treatment from physicians acting at the direction of Dr. Pfeiffer. Rather, Plaintiff next received treatment in the emergency room at the VA from a Dr. David Luse, who advised Plaintiff to rest his leg and take Ibuprofen. *Id.* at 7. Dr. Luse also referred Plaintiff to "one specialist then to another," none of whom provided "ultimate

6

supervision." *Id.* at 7–8. Moreover, medical records that Plaintiff attaches to his complaint show that other physicians, possibly at the VA, as of November 2014, diagnosed and recommended treatment for Plaintiff's left foot pain. *See id.* at 42 (diagnosing possible "partial thickness tear"), 43 (recommending plan to place Plaintiff in a walking boot and refer him to a foot and ankle specialist), 45 (diagnosing possible edema). As these facts demonstrate, the "unique" relationship that Plaintiff had with Dr. Pfeiffer did not extend beyond January 2014 to toll the limitations period; nor did treatment through nerve conduction testing continue thereafter. Thus, what Plaintiff asserts is a specific claim of negligence against a specific doctor on a specific date. *See Ciccarone v. United States*, 486 F.2d 253, 256–57 (3d Cir. 1973) (rejecting, the application of the continuous-treatment doctrine where "appellant was aware of the deterioration in his health immediately following the methylene blue dye procedure" and "there was no allegedly negligent activity by any government physician after that date" in an FTCA case) *cited with approval in Page,* 729 F.2d at 823 n.36; *see also Wehrman*, 830 F.2d at 1485 (distinguishing *Ciccarone* as involving "complained of negligence by a specific neurologist on a specific date"). Based on the present pleading, Plaintiff therefore cannot plausibly rely on the continuous-treatment doctrine to toll—for nearly 16 months, from January 2014 to May 2015—the start of the two-year limitations period.

IV.

For the foregoing reasons, Defendant's Motion to Dismiss is granted without prejudice. Plaintiff's Request for Judgment is denied.

The court will not dismiss the case at this time, however. *See Ciralsky v. CIA*, 355 F.3d 661, 666–67 (D.C. Cir. 2004) (distinguishing between dismissal of the complaint and dismissal of the action or case). The court is cognizant that dismissals based on limitations concerns are

7

disfavored because determining limitations accrual often involves fact questions. *See Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996). Thus, dismissal on limitations grounds is appropriate "only if the complaint on its face is conclusively time-barred." *Id.* Accordingly, the court will afford Plaintiff 21 days from this date to file an amended complaint that endeavors to allege timely claims consistent with this opinion. That means, Plaintiff must allege facts that plausibly establish that the FTCA's two-year limitations period began to accrue on or after May 31, 2015. If Plaintiff does not file an amended complaint within 21 days, the court will enter a final, appealable order dismissing this case.

Dated: December 7, 2018

Amit P. Mehta
United States District Judge